# EXHIBIT B

1

```
1                  IN THE UNITED STATES DISTRICT

2          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3   STEPHANIE HIGGINS, for herself and   )
    all others similarly situated,       )
4                                        )
                Plaintiffs,              )
5                                        )
          vs.                            )  No. 3:16-cv-02382-MEM
6                                        )
    BAYADA HOME HEALTH CARE, INC.,       )
7                                        )
                Defendant.               )
8

9           The discovery deposition of ELLEN MOTTA,

10   taken remotely via Zoom videoconference in the

11   above-entitled cause, before Andrew R. Pitts, Certified

12   Shorthand Reporter of the State of Illinois, on August 28,

13   2020, pursuant to Notice, commencing at 11:11 a.m. EST.

14

15

16

17

18

19

20

21

22                       REPORTED BY:
                 ANDREW R. PITTS  CSR, RPR
23               LICENSE NO.:  084-4575

24
```

**3**

1   APPEARANCES:

2   STEPHAN ZOURAS, LLP
    BY:  MS. TERESA M. BECVAR, Esquire
3   BY:  MS. MEGAN E. SHANNON, Esquire
    100 North Riverside Plaza
4   Suite 2150
    Chicago, Illinois  60606
5   Phone:  312.233.1550
    E-mail:  Tbecvar@stephanzouras.com
6   E-mail:  Mshannon@stephanzouras.com

7           Appeared on behalf of the Plaintiffs;

8   BUCHANAN INGERSOLL & ROONEY, PC
    BY:  MR. THOMAS G. COLLINS, Esquire
9   409 North Second Street
    Suite 500
10  Harrisburg, Pennsylvania 17101-1357
    Phone:  717.237.4843
11  E-mail:  Thomas.collins@bipc.com

12          Appeared on behalf of the Defendant.

13

14

15  ALSO PRESENT:

16      MS. NORI FEY, Corporate Counsel

17
18
19
20
21
22
23
24

---

**3**

1               I N D E X

2   ELLEN MOTTA (remote)              EXAMINATION

3       BY MS. BECVAR                         5

4

5

6               E X H I B I T S

7   LETTER              DESCRIPTION          MARKED
                                              FOR ID

8   Exhibit M    Bayada 04386, case conference e-mail   48

9

10  Exhibit A    Bayada 00929-00935, Employment Tracks,  52
                 Compensation and Benefits

11

12  Exhibit G    Bayada 99423-99425, Non-Visit Activity   76
                 vs. Other Pay

13

14  Exhibit H    Bayada 05215-05216, paperwork reminders 81
                 e-mail

15

16  Exhibit J    Bayada 06462, commitment policy          86

17
18
19
20
21
22
23
24

---

**4**

1       THE REPORTER:  My name is Andrew Pitts, an Illinois

2   State certified shorthand reporter, and this deposition is

3   being held via videoconferencing and telephonic equipment.

4   The witness and reporter are not in the same room.

5           The witness will be sworn in remotely pursuant

6   to agreement of all parties.  The parties stipulate that

7   the testimony is being given as if the witness was sworn

8   in, in person.

9           Does everyone agree?

10      MS. BECVAR:  Yes.

11      MR. COLLINS:  Yes.

12      MS. BECVAR:  I agree on behalf of the Plaintiffs.

13      MR. COLLINS:  I agree on behalf of the Defendant.

14      THE REPORTER:  Okay.  Ms. Motta, please raise your

15  right hand.

16              (Whereupon, the witness was

17               administered an oath.)

18  //

19  //

20  //

21  //

22  //

23  //

24  //

---

**5**

1               ELLEN MOTTA,

2   called as a witness herein, having been first administered

3   an oath, was examined and testified remotely via

4   videoconference as follows:

5               EXAMINATION

6   BY MS. BECVAR:

7       Q.    Good morning, Ms. Motta.  My name is Teresa

8   Becvar, and I'm the attorney for Plaintiff Stephanie

9   Higgins and the members of the collective action in this

10  case.

11          Can you please state and spell your name for

12  the record.

13      A.    **Ellen, E-L-L-E-N, Motta, M-O-T-T-A.**

14      Q.    And, Ms. Motta, have you ever been deposed

15  before?

16      A.    **Yes.**

17      Q.    Okay.  And how long ago was that?

18      A.    **Boy.  Within the past year.**

19      Q.    And was it related to your employment with

20  Bayada?

21      A.    **Yes.**

22      Q.    And what were the circumstances of that

23  deposition?  How did it arise?

24      A.    **It was about a client in a particular office,**

6

1 and there were other, you know, obviously a multitude of
2 people involved other than Bayada that were asked
3 questions about the client's care.
4    Q.   And so was it with regard to, like, a medical
5 malpractice type of case?
6    A.   Yes.
7    Q.   So the deposition was regarding the care that
8 was provided by Bayada, correct?
9    A.   By Bayada, yes.
10    Q.   And you said that deposition happened in 2020?
11    A.   Oh, I can't remember exactly. It was within
12 the past year. I apologize.
13    Q.   Okay. That's fine. Was it taken via
14 videoconference like this one?
15    A.   No, it wasn't.
16    Q.   So before we get started, we are going to go
17 over some of the ground rules for a deposition. You've
18 heard this before, and I'm sure your counsel has explained
19 it to you.
20        We're doing this via videoconference, so there
21 may be some technical issues. And it's especially
22 important to follow these rules as best we can so that we
23 can get a good clear record for the court reporter.
24        The first rule is very simple. You must give

7

1 an audible response to every question that is asked. We
2 can see each other, you can nod your head, but I need a
3 "yes" or "no" so that there's a clear response on the
4 record.
5        The second rule, let's not speak over each
6 other. So if I'm asking you a question, you may
7 anticipate the end of the question, but don't speak before
8 I'm done asking the question, and I'll try to do the same
9 for you.
10        If there is any question that I ask you that
11 you don't understand, please feel free to ask me to repeat
12 the question or rephrase it. That said, if you do answer
13 a question, we are going to assume that you understood the
14 question that is asked.
15        And then, finally, you can take a break
16 anytime that you want, just let us know. The only rule
17 about taking breaks is you have to answer whatever
18 question is pending at the time, and then we can find a
19 time to take a break for all of us. And the rest of us
20 may chime in as well if any of us need a break.
21        So do you understand all these ground rules I
22 went through?
23    A.   Yes, I do.
24    Q.   All right. So, Ms. Motta, do you understand

8

1 that you are here for a lawsuit filed by Stephanie Higgins
2 against Bayada Home Care?
3    A.   Yes.
4    Q.   And have you reviewed a copy of the complaint
5 in that case?
6    A.   I did.
7    Q.   Do you recall when you saw a copy of that
8 complaint?
9    A.   Oh, it was a while ago.
10    Q.   If I --
11    A.   A couple years ago.
12    Q.   Okay. If I represent to you that the lawsuit
13 was filed in November 2016, do you think it was around
14 that time?
15    A.   I do not recall.
16    Q.   But at least a couple years ago then?
17    A.   Yes.
18    Q.   And who provided that complaint to you?
19    A.   Oh, I do not recall.
20    Q.   Do you recall anything about the circumstances
21 of looking at a copy of the complaint?
22    A.   Yes.
23    Q.   What do you remember?
24    A.   I --

9

1        MR. COLLINS: Ellen, before you answer that, I just
2 want to say I don't want you to disclose any conversations
3 that you have had with either myself or Nori Fey or any
4 lawyers in the case, but otherwise you are free to answer
5 the question.
6 BY MS. BECVAR:
7    Q.   That is correct, I don't want to hear the
8 content of any of your discussions with counsel.
9    A.   Sure. The main reason, I believe, for
10 Stephanie bringing this case has to do with her pay and
11 some problems she may have had with how she was paid
12 through Bayada.
13    Q.   But you don't remember who gave you that
14 complaint, you know, whether it was an e-mail or whether
15 it was a meeting or anything like that?
16    A.   I truly don't remember.
17    Q.   And so you just mentioned that you believe
18 that the complaint was -- that Stephanie had issues
19 concerning her pay. Is that the extent of your
20 understanding about the allegations in this case?
21    A.   Yes.
22    Q.   And have you ever met Stephanie Higgins?
23    A.   Yes.
24    Q.   And under what circumstances?

10

1    A.    Sometimes she would be in a meeting where
2 I was there as well, sometimes she was in the office, she
3 may have come in for a meeting or for some other reason,
4 in those types of situations.

5    Q.    And what types of meetings are you referring
6 to that Stephanie Higgins would be present in?

7    A.    Like a staff meeting.

8    Q.    And who else was present at the staff
9 meetings?

10   A.    Other field staff as well as some office
11 staff.

12   Q.    And did you run the meetings, or was it
13 someone else that ran them?

14   A.    Someone else.

15   Q.    And who typically ran the staff meetings?

16   A.    Typically the director of the office or
17 sometimes clinical managers.

18   Q.    And do you remember at the time Stephanie was
19 employed who the director of the office would have been?

20   A.    That was Michael Hogan.

21   Q.    And did that change throughout -- or has
22 Michael Hogan been the director since the time Stephanie
23 as employed or has it changed since then?

24   A.    Oh, so I do want to make a correction.  They

11

1 actually had another team member director.  I'm sorry.
2 His name was Mark Malacavage.

3    Q.    And when you say team area director, what
4 distinction are you making there?

5    A.    There were two teams in the office, and they
6 were directed by two different directors.

7    Q.    And when you refer to the office, which Bayada
8 office are you referring to?

9    A.    Wilkes-Barre Scranton Visit office.

10   Q.    Did you attend all of the staff meetings of
11 the Wilkes-Barre Scranton Visit office?

12   A.    No, I didn't.

13   Q.    About how often would you attend staff
14 meetings?

15   A.    That's hard to say.  It was random, just if
16 I was visiting the office.  So it's really hard to say.
17 If I was there that day and they were having a meeting,
18 I would attend.

19   Q.    And were you based out of a different office
20 then?

21   A.    I actually didn't really have an office being
22 that I was remote and visiting other offices.

23   Q.    And so when you attended staff meetings, did
24 you interact directly with Stephanie Higgins at those

12

1 meetings?

2    A.    I really don't recall.

3    Q.    And other than that, when you said you also
4 saw Stephanie around the office at times, do you remember
5 interacting directly with her at the office?

6    A.    I may have said hi.  There was conversation,
7 a friendly conversation coming in and out of the office.

8    Q.    Other than that, do you remember any
9 interactions with Stephanie Higgins?

10   A.    In the office?

11   Q.    In the office, yes.

12   A.    Oh.  That was basically my type of
13 interaction I've had with her.

14   Q.    And then outside of the office, have you had
15 any interaction with Stephanie?

16   A.    On a friendly basis are you asking or
17 outside -- I'm not quite sure I understand.

18   Q.    On a social or friendly basis, yeah, either,
19 just any interaction.

20   A.    Just when I was in the office up in the
21 Wilkes-Barre Scranton Visit office.

22   Q.    Okay.  Do you remember exchanging any e-mails
23 at any time with Stephanie Higgins?

24   A.    Not that I can recall.

13

1    Q.    Are you familiar with Ms. Higgins' work
2 history at Bayada?

3    A.    Can you elaborate?

4    Q.    Sure.  Were you involved in hiring
5 Ms. Higgins?

6    A.    No, I was not.

7    Q.    Do you know who was?  And I can let you know
8 that she was hired in 2012, if that helps.

9    A.    I wouldn't know who hired her.

10   Q.    Were you involved in negotiating any pay for
11 Ms. Higgins?

12   A.    No, I was not.  I was not involved in her
13 hiring process.

14   Q.    To your knowledge, did Ms. Higgins have any
15 disciplinary issues while she was employed at Bayada?

16   A.    Not to my knowledge.

17   Q.    Did you do anything to prepare for today's
18 deposition?

19       MR. COLLINS:  And, again, I don't want you to talk to
20 her about anything that you discussed with myself or Nori
21 or any specific documents or identify any specific
22 documents that we may have given you other than I will
23 represent to Teresa that they are documents that have been
24 exchanged for use in the case, and there is nothing new.

14

1    THE WITNESS: The only -- oh.

2    MS. BECVAR: Go ahead and answer the question.

3    MR. COLLINS: Yeah, you can go ahead and answer.

4  Yeah.

5    THE WITNESS: Okay.

6  BY THE WITNESS:

7    A.    **The only thing I have reviewed is the policy**

8  **that we have in place for all employees, which is on their**

9  **hiring and the track policy.**

10 BY MS. BECVAR:

11   Q.    The employment tracks?

12   A.    **Yes.**

13   Q.    Okay. And like your counsel said, don't

14 reveal to me any contents of the discussions with counsel,

15 but did you meet with counsel?

16   A.    **Did I --**

17   MR. COLLINS: You can answer that.

18 BY THE WITNESS:

19   A.    **Oh, yes. Yes.**

20 BY MS. BECVAR:

21   Q.    Yeah, you can -- okay.

22       And when did you meet with counsel.

23   MR. COLLINS: You can tell her when we met, like, how

24 long we met. You just can't tell her what we talked about.

---

15

1    I'm sorry. I didn't mean to interrupt, Teresa.

2  I can just see that she is hesitating to answer.

3    MS. BECVAR: No, that's okay.

4  BY THE WITNESS:

5    A.    **I believe I met -- I'm trying to remember the**

6  **date. Oh, my birthday, August 14th -- how could I**

7  **forget -- and today.**

8  BY MS. BECVAR:

9    Q.    Okay. And on August 14th, was that via phone

10 call, via videoconference?

11   A.    **Zoom.**

12   Q.    Zoom. Okay. And for how long did you meet

13 with counsel on that day?

14   A.    **Probably it was about 50 minutes.**

15   Q.    Did you say 50, like a little less than an

16 hour?

17   A.    **I did, yes.**

18   Q.    Okay. And then you said you also met with

19 counsel today to prepare?

20   A.    **I met with them today.**

21   Q.    And how long was that meeting?

22   A.    **About 20 minutes, 25 minutes.**

23   Q.    And other than your counsel, have you

24 discussed today's deposition with anyone?

---

16

1    A.    **No, I was not.**

2    Q.    Next, I just need to get some background

3  information from you. It's standard information that we

4  get in depositions.

5       Have you ever been known by any other name?

6    A.    **My maiden name, Ellen Lattanze.**

7    Q.    And can you just spell that for me.

8    A.    **Sure. L-A-T-T-A-N-Z-E.**

9    Q.    And any other names?

10   A.    **No.**

11   Q.    And what is your home address?

12   A.    **915 Maplewood Drive, and that is in**

13 **Douglassville, D-O-U-G-L-A-S-S-V-I-L-L-E, Pennsylvania,**

14 **19518.**

15   Q.    And how long have you lived there?

16   A.    **2003 I moved in, so 17 years.**

17   Q.    And what is your date of birth?

18   A.    **8/14/63.**

19   Q.    Happy belated.

20   A.    **Thank you.**

21   Q.    Have you ever been convicted of a felony?

22   A.    **No.**

23   Q.    And have you ever been convicted of any crime

24 involving dishonesty, like theft?

---

17

1    A.    **No.**

2    Q.    Do you have any degrees?

3    A.    **I have an associate degree in nursing.**

4    Q.    And when did you receive that degree?

5    A.    **1989.**

6    Q.    And from what institution?

7    A.    **Montgomery County Community College.**

8    Q.    Any other degrees?

9    A.    **No.**

10   Q.    Do you maintain any professional licenses?

11   A.    **Just my nursing license.**

12   Q.    When was the last time you worked as a nurse?

13   A.    **Do you mean hands-on care? Because I'm**

14 **still -- I still have an active license.**

15   Q.    Right. Right. Hands-on care.

16   A.    **Oh, I would say -- let's see. The last time**

17 **I provided care was maybe around 2006, '07.**

18   Q.    And have you ever worked as a field nurse

19 providing home health visits?

20   A.    **Yes.**

21   Q.    And when was that?

22   A.    **That was with another organization. Did**

23 **you -- were we speaking specifically with Bayada, about**

24 **Bayada?**

18

1    Q.    No.  No.

2    A.    **Oh, okay.**

3    Q.    Just in general.

4    A.    **Sure.  Okay.  That was -- let's see.  That**

5    **was back in the early '90s.  I want to say the '91, '92,**

6    **'93-ish.**

7    Q.    Okay.  And what organization did you work for

8    back then?

9    A.    **That was with Quaker Home Health.**

10   Q.    Do you currently work for Bayada?

11   A.    **Yes, I do.**

12   Q.    Are you currently on furlough from your

13   position at Bayada?

14   A.    **Yes, I am.**

15   Q.    But you haven't been formally separated from

16   employment at all, correct?

17   A.    **No, I haven't.**

18   Q.    How long have you worked for Bayada?

19   A.    **I was hired October 17, 1994.**

20   Q.    So roughly 26 years then?

21   A.    **Just about, yes.**

22   Q.    And I'm not going to go through your whole job

23   history, but what was your first job title when you

24   started?

19

1    A.    **I was a nursing supervisor.**

2    Q.    And what office was that in?

3    A.    **King of Prussia.**

4    Q.    So I'll just represent for you the time frame

5    that we're looking at for this lawsuit is roughly the end

6    of 2013, beginning of 2014, to the present.

7          In that time period, end of 2013, what was

8    your job position at Bayada?

9    A.    **2013.  I believe I was director at that**

10   **point.**

11   Q.    And how long did you hold that director

12   position?  When did you switch to your next one?

13   A.    **So I was hired as a director in 2005, and**

14   **I became an area director after that.  And I'm trying to**

15   **remember the year.  And I want to say it could have been**

16   **the end of 2013, 2014.  I'm not quite sure of the exact**

17   **date.**

18   Q.    But your next step was going from director to

19   area director?

20   A.    **Correct.**

21   Q.    And you said you think that is probably

22   2013-2014?

23   A.    **Right around there, I believe, yes.**

24   Q.    And it's fine if you don't remember.  It's not

20

1    a memory test today, but I am entitled to your best

2    recollection of time frames.

3          So as director, were you director over an

4    entire office?

5    A.    **Yes, I was.**

6    Q.    And which office was that?

7    A.    **Berks County Visit office.**

8    Q.    And was it just that one office, or were there

9    multiple?

10   A.    **As a director, it was just one office.**

11   Q.    And as director, what were your primary

12   day-to-day job duties?

13   A.    **Managing the operations of the office, so**

14   **managing the office staff and ensuring that they were**

15   **managing the field staff and were providing care to the**

16   **clients.**

17   Q.    And were you considered the head of that

18   office then?

19   A.    **The director is the leader of the office,**

20   **yes.**

21   Q.    And while you were director there at the end

22   of 2013, who did you report to?

23   A.    **Jean Ritter.**

24   Q.    And is it Ms. Ritter?  Was it a she --

21

1    A.    **That is -- are you asking if she's a Ms. or**

2    **Mrs.?**

3    Q.    Yeah.  Yeah -- no.  No.  I mean --

4    A.    **Mrs. -- oh.**

5    Q.    Oh, no, I mean whether she was a she or a he.

6    A.    **Oh, she.  I'm sorry.**

7    Q.    Okay.  So J-E-A-N, Ms. Ritter then?

8    A.    **Correct.  Yes.**

9    Q.    And what was her title?

10   A.    **She was a division director.**

11   Q.    And what was the division that she was

12   director over?  Was it an area?

13   A.    **It was called the Clover division, so yes, it**

14   **comprised a few offices.**

15   Q.    And what area or what offices were in the

16   Clover division?

17   A.    **Okay.  Let's see if I can remember all of**

18   **them.  I know there were some in Bucks county.  Of course**

19   **the Berks County office.  Oh, my.  Bucks and possibly a**

20   **few in Montgomery.**

21   Q.    Okay.

22   A.    **I'm -- I do not recall all the offices.**

23   Q.    Okay.  Does it -- I guess my --

24   A.    **Oh, and of course the Wilkes-Barre Scranton**

22

1    office.  Sorry about that.

2         Q.    Yeah.  My question might be a little more

3    broad that than that.

4               So the Clover division, was it all within

5    Pennsylvania?

6         A.    Yes.

7         Q.    But it didn't cover all of Pennsylvania?

8         A.    The Clover division -- oh.  I do not recall.

9    I'm thinking of the offices that I just mentioned to you.

10   So I do not know exactly.

11        Q.    That's fine.  So looking at the organizational

12   structure of Bayada, there's each individual office.

13   Beyond the offices, is there an area that's smaller than a

14   division, or is division the next --

15        A.    It's by division, and then there's regions.

16        Q.    Okay.  And so then what region were you in as

17   director?

18        A.    If you asked a question, I did not hear you.

19   I'm sorry.  You broke up a little bit.

20        Q.    Oh, sorry.  Oh, no problem.  What region were

21   you in when you were in the Clover division?

22        A.    Well, I believe the organization had some

23   structure changes after it was the Clover division, then

24   they broke up into regions.  So it was during my time at

---

23

1    that point when it became a region.  Jean Ritter became a

2    regional director, which at that point did become all of

3    Pennsylvania, but that was later on.

4         Q.    Great.  Thanks for the clarification.

5               And so did the region then extend beyond

6    Pennsylvania?

7         A.    I believe Sycamore is all of Pennsylvania.

8         Q.    And do you have a sense of how many regions

9    Bayada has nationwide?

10        A.    So let's see.  There's -- this is surely a

11   test there isn't it?  Oh, yes, we have Sycamore.  One,

12   two, three -- maybe five.

13        Q.    And they all have different designations, but

14   you just said Sycamore was the one that you were in?

15        A.    That is -- yes, Sycamore was the one I was

16   in.

17        Q.    So in your role as director, were you involved

18   in hiring sales clinicians?

19        A.    Yes.

20        Q.    And how are you involved in hiring clinicians?

21        A.    Well, as a director, the responsibility is to

22   ensure that you do have the proper number of caregivers to

23   care for the clients.  So once I established there was a

24   need for certain clinicians, I would have a recruiter put

---

24

1    an ad out.  And then once those employees -- or those

2    candidates would come my way, I would then be the one who

3    would interview them.

4         Q.    And as far as you know, is the job of

5    interviewing potential new hires one that all directors

6    perform?

7         A.    I can only speak for myself, but as a

8    director, I would be part of that interview process, the

9    initial interview process.

10        Q.    And would you interview -- when you decide to

11   hire a candidate -- I assume you decide whether to hire

12   the candidate.  Are you involved in the process of

13   negotiating their pay?

14        A.    Yes.

15        Q.    And explain that to me.  How would you set a

16   pay rate for a field clinician?

17        A.    So I would typically look at the resume along

18   with that interview process, and based on, you know, the

19   experience and what the needs were of the office, at that

20   point I would determine the rate of that point to hire

21   that individual.

22        Q.    Did you have any resources that you consulted

23   for, you know, typical clinician pay rates?

24        A.    I would actually speak with colleagues in the

---

25

1    area, you know, because, obviously, region to region is

2    slightly different; of course my boss, Jean; and having

3    conversations with the recruiter.  So it definitely was a

4    team approach.

5         Q.    So after director, you said you moved on to

6    area director, I believe.  Yeah, area director.  How long

7    were you in that role?

8         A.    Oh, I was in that role approximately two

9    years.

10        Q.    So that would bring us to about -- from 2014

11   to about end of 2016, or beginning of 2016, sorry.

12        A.    Probably the beginning of 2016.

13        Q.    And as area director, what was the area that

14   you covered?

15        A.    So the other office I was overseeing was in

16   Bethlehem.

17        Q.    So there were two offices then?

18        A.    I was in charge of the Berks County office as

19   well as the Bethlehem office.

20        Q.    And how did your duties change from director

21   moving to area director?

22        A.    So, technically, I was still a director

23   because I did have to still manage the Berks County

24   office; however, having oversight over the Bethlehem

---

26

1   office, I would meet with that director of that office,
2   obviously make some site visits, and just to ensure that
3   that director was -- again, that the operations of the
4   office were running effectively.
5       Q.   So no one backfilled your director position at
6   the Berks County office then; you were still performing
7   those duties?
8       A.   Correct, at that time.
9       Q.   And then as area director, did you still
10  report to Jean?
11      A.   Yes.
12      Q.   And where was Jean Ritter located?
13      A.   I believe that's a remote position as well.
14      Q.   And then moving on, at the beginning of 2016,
15  what was the next position you had at Bayada?
16      A.   Division director.
17      Q.   And how long did you hold that position?
18      A.   I held that position until March, the end of
19  March of 2019.
20      Q.   And in March 2019, what position did you move
21  into?
22      A.   I am now a director with the strategic
23  ventures division.
24      Q.   And in this current role, are you involved in

27

1   oversight of field clinicians in any way?
2       A.   No, I am not.
3       Q.   Do you have any responsibility over pay
4   practices in this role?
5       A.   You broke up a little.  I apologize.  Can you
6   repeat that?
7       Q.   In your current role, do you have any
8   responsibility over pay practices?
9       A.   No, I don't.
10      Q.   So stepping back to your time as division
11  director, which was approximately between early 2016 and
12  March 2019, was there a name for the division that you
13  were director over?
14      A.   Yes.  It was the Shamrock position.
15      Q.   Do you know where these names come from, just
16  out of curiosity?
17      A.   Well, all divisions are named after flowers,
18  and the division director is the one who chooses the
19  flower once they are put in that position.
20      Q.   Oh.  And so you chose the designation of
21  Shamrock?
22      A.   Well, it actually was Shamrock before me.
23  The Clover turned -- it's, again, the reorganization, it
24  turned into the name Shamrock.  There was just some

28

1   reorganization at that time with the names.
2       Q.   And so as a division director, what was the
3   area, approximately, that you were overseeing?
4       A.   So as division director, I was responsible
5   for the Berks County office, the Bethlehem office, the
6   Wilkes-Barre Scranton Visit office, and the East
7   Stroudsburg office.
8       Q.   And as division director, did you interact
9   with other division directors from other areas?
10      A.   Yes.
11      Q.   And in what way?
12      A.   Well, we would have a yearly division
13  director meeting where all division directors of the
14  company would come together.
15      Q.   And how long was that meeting?
16      A.   Usually a day or two.
17      Q.   And during that division director meeting,
18  what types of topics would be covered?
19      A.   So sometimes they would have professional
20  speakers.  It's -- oh, it would be sometimes with
21  professional development, if there were any type of new
22  developments coming out of Medicare, things like that.
23      Q.   At meetings, did issues of employee
24  compensation ever come up, or was that a subject matter

29

1   that was discussed?
2       A.   I don't recall that.
3       Q.   And then other than this annual division
4   director meeting, did you have other occasion to interact
5   with other division directors?
6       A.   So sometimes there are Zoom meetings.  They
7   were once a week from our practice president who -- he
8   would be the one to facilitate that meeting.  So we would
9   all be on Zoom, and he would be the one facilitating by
10  Zoom, not in person.
11      Q.   And who was the practice president?
12      A.   Michael Johnson.
13      Q.   And did you report to him or someone else?
14      A.   No, I reported to Jean Ritter.
15      Q.   So this whole time from the end of 2013 until
16  2019 when you moved to a new role, you always reported to
17  Jean Ritter?
18      A.   Yes.
19      Q.   And in these weekly Zoom meetings, what types
20  of topics came up?
21      A.   Oh, like new initiatives coming up, talking
22  about sometimes how the business was doing, things like
23  that, just like a touchpoint, basically.
24      Q.   And so I think you mentioned this before, but

30

1   as a division director, you worked remotely, correct?

2        A.   Correct.  I would just travel to the

3   different offices.

4        Q.   And how often would you visit each office?

5        A.   Again, it was different week to week, month

6   to month.  Sometimes I would go to offices weekly,

7   sometimes every two weeks.  It really wasn't any type of

8   set schedule.

9        Q.   And as division director, who reported

10  directly to you?

11       A.   The directors of the offices.

12       Q.   And were there area directors then that also

13  were in the mix?

14       A.   Not under me, no.  No.

15       Q.   So as division director, did you have

16  involvement in implementing Bayada's compensation

17  policies?

18       A.   I did not implement any of the policies.

19       Q.   Did you communicate compensation policies?

20       A.   If the director had a question about any type

21  of -- you know, with a policy maybe clarification, that's

22  something, they would reach out to me, and we would have a

23  conversation if that needed, you know, to be done.

24       Q.   So since the end of 2013, did you have any --

31

1   and I know we talked about when you were director, you had

2   a role in hiring field clinicians, but after that period,

3   did you have a role in hiring field clinicians?

4        A.   So a director of the offices would be the

5   ones who would hire for their offices.

6        Q.   And then you said the director of the offices

7   works with a recruiter?

8        A.   Yes.

9        Q.   Where were the recruiters located?

10       A.   They're based in our headquarters.

11       Q.   And do the recruiters create the job postings?

12       A.   They would work with the director to find out

13  exactly what the needs were, and they would do it

14  together, but they would actually do the posting, yes.

15       Q.   And who would screen the applicants?

16       A.   The recruiter would be the first point of

17  contact to do that.

18       Q.   And so then the recruiter would screen

19  applicants and provide a list of people to the

20  director for interviews?

21       A.   Correct.

22       Q.   And then besides the director, are there any

23  other that are involved in reviewing applicants?

24       A.   Yes.  Sometimes the director may ask the

32

1   clinical manager to come in or even a client services

2   manager.

3        Q.   And then who is responsible for the onboarding

4   process once a field clinician is hired?

5        A.   So that's a team effort.  It really does

6   involve the director, clinical manager, client services

7   manager.  There's also an educator and then, of course,

8   preceptors who are field staff that are chosen to precept

9   them once they are out in the field.

10       Q.   And is a preceptor then is just another fellow

11  field clinician who walks the new hire through the

12  process; is that a correct characterization?

13       A.   It's someone from the field, right, that the

14  office has chosen to precept that person once they

15  are in the field, correct.

16       Q.   And do field clinicians get extra pay for

17  serving as preceptors?

18       A.   That is, I believe, up to the director, but

19  yes, that has been done.

20       Q.   You said one of the individuals involved in

21  the onboarding process is an educator.  Where are the

22  educators based?

23       A.   So I can only speak for the Shamrock

24  division.  She, again, usually would have a home office

33

1   but then would be remote because she would have to go to

2   the other offices.  Once a new hire is hired, she may have

3   to go to that other office.

4        Q.   So the Shamrock division had one educator

5   assigned to that division?

6        A.   That is correct.  And I believe that

7   started -- now, that's something that started, I believe,

8   back in 2015, 2016.

9        Q.   Before that, how was it done?

10       A.   It was done directly in the office and,

11  again, team effort.

12       Q.   Okay.

13       A.   Some people just had different pieces to be

14  responsible for.

15       Q.   And so once the educator role began in, you

16  said, 2015, did that educator report to headquarters, or

17  did they report to you or someone else?

18       A.   She would report to me.

19       Q.   And in your division, who was the educator?

20       A.   I apologize.  That is -- I'm sorry.  She

21  reported to the director of clinical operations.

22       Q.   And is there a certain person you are

23  referring to as the educator?

24       A.   Yes.

34

1    Q.    What was her name?

2    A.    **Jenny Long.**

3    Q.    And who is the director of clinical

4 operations?

5    A.    **Ellen Maher, M-A-H-E-R.**

6    Q.    And was she a director of just one office or

7 multiple offices?

8    A.    **Ellen Maher?**

9    Q.    Yes.

10    A.    **She was responsible for the same offices**

11 **I was responsible for, and she was responsible for the**

12 **quality within the division, the clinical quality.**

13    Q.    Within the Shamrock division then, correct?

14    A.    **Correct, yes.**

15    Q.    So for field clinicians when they are first

16 hired, who determines how they are paid, you know, what

17 track, I guess, that they're on?

18    A.    **That typically would be the director.**

19    Q.    And we have mentioned these employment tracks

20 at Bayada.  Are you familiar with what all of them are?

21 Could you name them for me?

22    A.    **Yes.  So there is a full time benefitted, and**

23 **there is a part time benefitted, part time without**

24 **benefits, and then per diem.**

---

35

1    Q.    And so when a new field clinician is newly

2 hired, the director along with the clinician decides which

3 one of these tracks to assign them, correct?

4    A.    **Correct.**

5    Q.    Is there anyone else involved in that

6 division?

7    A.    **Ultimately, the director does make those**

8 **decisions for the office.**

9    Q.    And once a field clinician is assigned one of

10 these tracks, do they ever move between them?

11    A.    **That would be a discussion.  There have been**

12 **times where an employee, say, does not want to be**

13 **guaranteed anymore, maybe wants to be per diem, sure, that**

14 **could happen.**

15    Q.    Is that type of request always approved?

16    A.    **I would have -- that's something that would**

17 **be an individualized basis between the director and that**

18 **employee.**

19    Q.    So the director has the discretion to not

20 approve of a field clinician's request to move from one

21 track to another?

22    A.    **I think that would depend on the information.**

23    Q.    On what information?

24    A.    **It's very broad.  I think it would -- can you**

---

36

1 **maybe present another scenario?**

2    Q.    I'm just asking whether a director has

3 discretion to not approve a clinician's request to change

4 a track.

5    A.    **I'm sure there could be.  It depended on the**

6 **situation.**

7    Q.    Okay.  And so if a clinician asked to move

8 from full time with benefits to per diem, are there

9 circumstances that you can think of when that would not be

10 approved?

11    A.    **No.**

12    Q.    Are clinicians ever involuntarily moved

13 between tracks?

14    A.    **Maybe if there was some type of disciplinary**

15 **reason or they were not able to fulfill their**

16 **expectations.**

17    Q.    And by fulfill their expectations, do you mean

18 meet the required number of visits that they are expected

19 to perform in a week?

20    A.    **That could be one of them.**

21    Q.    What other types of expectations?

22    A.    **Maybe if they were not sufficiently up to par**

23 **with maybe documentation, maybe they just started a few**

24 **months ago, but they wanted to maybe go full time, but**

---

37

1 **they're not quite ready, so that would be between the**

2 **director and the clinical manager of maybe having that**

3 **discussion and then maybe putting a plan in place to help**

4 **them get to that point.**

5    Q.    And so going back to your time as director,

6 you said you would interview potential new hires.

7         Can you walk me through how you would explain

8 Bayada's compensation plan to someone who is, you know,

9 newly introduced to the company?

10    A.    **Sure.  So if I was ready to have that**

11 **conversation with them, and it was a full time, say,**

12 **guaranteed employee, I would let that individual know that**

13 **in order to do this role, you would be hired at, say,**

14 **30 points a week.  The expectation is for you to be**

15 **available to work to do that.**

16         **There may be times where you may have to go**

17 **out of your area if you were not up to meeting those**

18 **points, and you would also, you know, depending on --**

19 **let's say it's towards the end of the week, and you're**

20 **maybe at 26 points, we didn't have any other work for you,**

21 **and at that point, you would still get paid basically.**

22 **It's like -- it's a salaried position.**

23         **So if you weren't meeting exactly, you would**

24 **still be guaranteed that week to week that is considered**

38

1    that guarantee, that salary position.

2        Q.    Okay.

3        A.    And I also would have a conversation with

4    them if they're interested, say, in making more money, a

5    lot of times I may say they may have that opportunity if

6    we have more work for you above and beyond that 30 points,

7    by all means they can do that, and then they would get

8    extra money for those points.

9        Q.    So a full time guaranteed clinician receives a

10   set amount of pay each week based on a preestablished

11   number of visits that they are expected to perform,

12   correct?

13       A.    Correct.

14       Q.    Or, actually let me rephrase that a little

15   bit, a preestablished number of points that three expected

16   to earn, correct?

17       MR. COLLINS:  I am going to object to the form on

18   that one.

19       MS. BECVAR:  Yeah, let me back it up a little bit.

20   BY MS. BECVAR:

21       Q.    So what is the relationship between visits and

22   points?

23       A.    So an admission is weighted as 2 points, if

24   they did an admission visit.  A recertification point is

39

1    considered 1.5 points.  And then any subsequent visit,

2    discharge visit, is considered 1 point.

3        Q.    And do you know how these numbers of points

4    were assigned to visit types?

5        A.    I was not involved in that.

6        Q.    Did that predate your involvement in

7    overseeing clinician compensation?

8        A.    No, it just -- at that level, it was not me

9    that implemented that policy.

10       Q.    Do you remember approximately how long ago

11   that policy was implemented?

12       A.    Oh, I really don't.

13       Q.    But it was sometime during your tenure?

14       A.    Correct.

15       Q.    So you remember being trained on it for the

16   first time, correct?

17       A.    I don't know if I remember being trained on

18   it for the first time, but --

19       Q.    So -- well, let me put it this way.

20             Before there was this point system, was there

21   a different type of pay system for full-time field

22   clinicians?

23       A.    No.  As far as I remember, it was by the

24   point.

40

1        Q.    And so it's safe to say you don't know who at

2    Bayada was responsible for developing this pay structure?

3        A.    I do not.

4        Q.    And so this preestablished number of visits,

5    or points -- I keep on saying visits, but it really should

6    be points -- is this called a productivity minimum?

7        A.    It is a productivity minimum that they are

8    given based on a set salary, yeah.

9        Q.    Okay.  And for each clinician, is that

10   productivity minimum individualized?

11       A.    Are you saying some employees might get

12   different points, if you could just --

13       Q.    Right.  Are they --

14       A.    Okay.

15       Q.    Yeah.  You used 30 as an example.  Could a

16   clinician have a minimum that is higher or lower than 30?

17       A.    Oh, sure, they may have different.

18       Q.    And how is that number determined?

19       A.    Well, that is based on, again, at the

20   interview process what she was looking to hire, and then

21   she would have a conversation with the individual to see,

22   you know, what they were looking for in regards to hours,

23   how much they wanted to work.  So it's all based around

24   that interview process.

41

1        Q.    And so kind of walk me through that

2    conversation.  How does that go?  You ask them many, "How

3    many hours do you typically want to work?"  And they tell

4    you, and then you say, "Well --" what do you say?

5        A.    So -- right.  So let's say there was an ad

6    out for full time, and you bring that individual in

7    thinking, of course, that individual is interested in full

8    time.  A lot of times, I do try to get some information

9    from them, again, their availability, you know, the areas

10   they are looking to go to.

11             Sometimes in that conversation, they could

12   say, "Well, I am available for three days a week," you

13   know, and sometimes that information comes out of it where

14   then that conversation might go a different way because

15   they are not able to meet that expectation.

16             However, I do continue to discuss with them

17   that there could be an opportunity based on what their

18   needs are.  And that's why the points may be different.

19   And then they would agree, the director would agree, and

20   then they would come to a decision based on that.

21       Q.    Okay.  So if a clinician said, "I can work

22   part time, I'm only available three days a week," then how

23   many points would that clinician be expected to perform?

24       A.    Well, that is so different across the board.

42

1    Again, depending on their availability, if they have to be
2    home you know for their child around, say, 2:00 or so,
3    they might want to just do 2 points a day.  So it is -- it
4    varies.  It really varies based on that conversation of
5    what they are able to commit to and, you know, what we're
6    able to offer them.
7        Q.    And to be eligible for benefits, is there a
8    certain minimum commitment that they need to make?
9        A.    That's really based on the director.  The
10   director can make that call.
11       Q.    And then to be considered, you know, full
12   time, is there a minimum commitment they need to make?
13       A.    Full time, well, that's where that 30 points
14   comes into play.
15       Q.    Okay.
16       A.    But that's typical, average.
17       Q.    That's average for a full-time employee is
18   30 points.
19       A.    Correct.
20       Q.    Are there other full-time employees that can
21   commit to a higher number of points?
22       A.    Well, based on my opinion, that's
23   something -- we really do leave it at the 30 just because
24   going over and beyond that each week, that's where the

43

1    question of quality care would come into play.  So,
2    typically, it would really -- that's where our average
3    number is.
4        Q.    So it's possible that -- you would say it's
5    theoretically possible, but you would discourage it; is
6    that fair?
7        A.    I'm just saying the practice I was involved
8    in as a director would be 30 points would be the maximum
9    to guaranteed.
10       Q.    And then to maintain full-time status, what is
11   the lowest number of points a clinician could commit to?
12       A.    So we have -- I have had the opportunity to
13   go, say, from 26 to 30 points, considered full time.
14       Q.    Okay.  To your knowledge, are there clinicians
15   who are at 25 points a week who are considered full time?
16       A.    I don't recall that.
17       Q.    So up until this point, we have only been
18   talking about the types of visits, but are there other
19   types of work activities that a field clinician does that
20   earn them productivity points?
21       A.    Are you talking just client care, what type
22   of client care, or --
23       Q.    Beyond client -- so client care is visits,
24   right?

44

1        A.    Correct.
2        Q.    So I'm saying --
3        A.    So you're saying other than client care.
4        Q.    Right, other than client care.
5        A.    Okay.  So, yes, there have been instances,
6    say, where there were not enough client visits for, say, a
7    particular employee.  Yes, we may have them come in and do
8    audits on some of the -- which is a regulation for
9    Medicare that we have to make sure that we provide audits
10   on client charts.
11       Q.    And any other types of work activities that
12   can earn productivity points?
13       A.    Meetings, staff meetings.
14       Q.    Okay.
15       A.    They could do that.
16       Q.    And so for when someone comes in and does a
17   chart audit, how is it determined how many productivity
18   points are earned for that work?
19       A.    So that would be based upon how long they
20   were in the office.  And then, you know, a point is
21   typically 1.33 hours, so based upon how long they were in
22   the office.
23       Q.    And are there other types of office work that
24   a field clinician can do to earn productivity points?

45

1        A.    So the audits, like I said, the meetings,
2    sometimes making up client admission packs, they are
3    typically the ones that I'm mostly familiar with.
4        Q.    And this sort of benchmark, 1 point is
5    1.33 hours, do you know where that came from?
6        A.    I was not involved with putting that policy
7    together, so I wouldn't know who put that together.
8        Q.    But to your knowledge, is it consistent for
9    all Bayada offices?
10       A.    For all offices, the Bayada Home Health
11   offices, as far as I know, yes.
12       Q.    And the same for the productivity points, the
13   assignment of certain number of points to certain types of
14   visits, is that consistent among all of the Bayada Home
15   Health offices?
16       A.    Well, again, I can speak to myself as a
17   director.  I would assume the others, but again, I can't
18   speak to them.
19       Q.    So you touched on this earlier, but to make
20   sure we have it clear, what happens if a field clinician
21   earns more productivity points than their minimum in a
22   certain week?
23       A.    They will get -- they would then get paid
24   each point that they earn above their salary guaranteed

46

1   points.

2        Q.    And that amount that they get paid per point,

3   how is that established?

4        A.    So, again, if they did an admission over and

5   beyond that 30 points, they would be paid 2 points; if it

6   was a recertification visit, the 1.5.  So that would have

7   still have been the same.  They would still get paid.

8        Q.    I understand.  So I mean, like, the dollar

9   amount, how is the dollar amount per point, how is that

10  established?

11       A.    Oh.  So what do you mean when they are hired,

12  how are they hired to that dollar amount, or are you

13  talking about when they go above and beyond?

14       Q.    I guess both.  Is it different?

15       A.    Yes, that rate stays the same.  What they are

16  hired for, they are paid that consistently, you know.

17  They are guaranteed that salary per week.  And then if

18  they go over, say they do three -- they see three clients,

19  okay, so let's say three of them are discharges.  They

20  would get paid that same rate per point that they always

21  get over and beyond that work.

22       Q.    Okay.

23       A.    Yes.

24       Q.    So if they are hired for 30 points and they

47

1   get -- I'm going to try to think of some easy math.

2        Well, let's just say they are hired for

3   30 points and they get $1,000 a week for those 30 points.

4   Then the amount they would get for each extra point would

5   be $1,000 divided by 30?

6        A.    So let's say it's $1,000, because we'll use

7   that easy number.

8        Q.    Yes.

9        A.    And let's say they do three regular visits on

10  top of this, say it's -- I'm just going to say it's $50.

11  Then they would get $150 because it's $50 per point.  If

12  that's what they were hired at $50 per point, that's what

13  they would get per point over and beyond.

14       Q.    Okay.  Let me flip it.

15       So if they are hired for $50 per point, their

16  weekly guarantee then is 30 times 50; is that true?

17       A.    Yes.  30.

18       Q.    Okay.

19       A.    Yeah.

20       Q.    Just making sure we are all on the same page

21  and saying the same thing.

22       MR. COLLINS:  Right.  And if anybody is doing the

23  math, that's a $1500 a week salary.

24       MS. BECVAR:  Okay.  Thank you.  I didn't want to have

48

1   to get out my calculator and embarrass myself.

2        MR. COLLINS:  I'm doing what I can to help you out

3   there.

4   BY MS. BECVAR:

5        Q.    So other than earning extra points, are there

6   other ways a field clinician can receive extra pay?

7        A.    That, to me, is the only way to get extra pay

8   that I know of for a field clinician.

9        Q.    And we may revisit this later.

10       Are field clinicians paid on an hourly basis

11  for any types of work that they do?

12       A.    I believe in the orientation phase, they get

13  paid hourly.  Other than that, after that, it's all the

14  guaranteed salary by points.

15       Q.    Okay.  Have you ever heard of clinicians being

16  paid hourly for case conferences?

17       A.    Not that I'm aware of.

18       Q.    Let's look at our first exhibit.

19       MS. BECVAR:  And, Andrew, I am going to do these a

20  little bit out of order.  The first one I want to pull up

21  is Exhibit M.

22            (Whereupon, Bayada Exhibit M was

23            presented to the witness.)

24       MS. BECVAR:  Okay.  So in the chat function, did you

49

1   can see a link pop up?

2        THE WITNESS:  The number 1 popped up.

3        MS. BECVAR:  Yes.  So click on that chat, and then it

4   will open a window with the link.

5        THE WITNESS:  Oh, okay.  So just click on that link?

6        MS. BECVAR:  Yeah, and then it will show you the

7   first document.

8   BY MS. BECVAR:

9        Q.    So just so that we identify this document --

10  and all the documents we talk about today are all numbered

11  in the bottom right corner with this Bayada number.  This

12  one is Bayada 04386.  And if you want to just take a look

13  at it and let me know when you're done.

14       A.    Okay.  I'm done.

15       Q.    Okay.  Do you know Charlene Tarnalicki?

16       A.    Yes.

17       Q.    And was she a clinical manager while you

18  were -- was she a clinical manager while you were a

19  director over this Wilkes-Barre Scranton office?

20       A.    While I was a division director?

21       Q.    Okay.

22       A.    I'm sorry.

23       Q.    And so she was clinical manager while you were

24  a division director?

50

1    **A.**    **Yes.**

2    **Q.**    And if you look on the date of this, March 1,

3    2013, were you a division director at that time?  I don't

4    believe that you were.

5    **A.**    **No, I was not.**

6    **Q.**    So would you have received this e-mail?

7    **A.**    **No, I would not.**

8    **Q.**    And at that time, do you know what Mary Claire

9    Pellegrini's position was?

10   **A.**    **She was director of that office.**

11   **Q.**    And then I believe we talked about Ellen Maher

12   before, but what was her position?

13   **A.**    **Director of clinical operations.**

14   **Q.**    And so reading this -- and I guess and then it

15   was sent to WSV all field staff.

16          What is your understanding of who received

17   this e-mail?

18   **A.**    **That would have been the entire field**

19   **clinician staff.**

20   **Q.**    For this one office or any others?

21   **A.**    **Correct.  "WSV-all field" would just go to**

22   **that office, field staff.**

23   **Q.**    Okay.  And if we look at the content of the

24   e-mail, it says, "Please note that in order to get paid

51

1    for one point for case conference, you must stay for the

2    entire conference, otherwise you will only be paid based

3    on hourly rate.  Any questions, please call."

4          Do you know anything about that policy?

5    **A.**    **I do not.**

6    **Q.**    And when you were director, was that a policy

7    in the office you were a director over?

8    **A.**    **When I was director, when any of the field**

9    **staff came in for a case conference in my office, they**

10   **were given a point for that case conference.**

11   **Q.**    And if they didn't stay the whole time, were

12   they still given a point?

13   **A.**    **As far as I can remember, yes.**

14   **Q.**    We can set that one aside or, I guess, close

15   it.

16   **A.**    **Okay.**

17   **Q.**    And so, to your knowledge, does the director

18   then have the discretion to assign hourly pay for certain

19   types of work that is performed?

20          MR. COLLINS:  I am going to object to the form.

21   I mean, are you asking her about hourly pay outside of the

22   guaranteed salary, or are you talking about the guaranteed

23   salary?

24          MS. BECVAR:  I'm talking about the hourly pay outside

52

1    of the guaranteed salary.

2    BY MS. BECVAR:

3    **Q.**    Does the director have the discretion to

4    assign hourly pay to certain types of work?

5    **A.**    **Not to my knowledge.**

6    **Q.**    So in that e-mail I just showed you, would the

7    clinical manager then be acting outside of her discretion?

8    **A.**    **I'm sorry, Teresa, you broke up.**

9    **Q.**    Okay.  I'm sorry.  In the e-mail I just showed

10   you then, would Ms. Tarnalicki be acting outside of her

11   discretion to do that?

12   **A.**    **I don't even know anything about that e-mail,**

13   **so it's -- I really can't answer that.**

14   **Q.**    But to your experience, is that something that

15   a clinical manager is permitted to do?

16   **A.**    **Not to my knowledge.**

17   **Q.**    All right.  So let's go back and go to our

18   next exhibit.  That is Exhibit A.

19          (Whereupon, Bayada Exhibit A was

20          presented to the witness.)

21   MS. BECVAR:  And actually before we start this, is

22   anyone ready for a break of any sort?

23   MR. COLLINS:  We've been going at it about an hour

24   and a half.  I mean, do you need a break, Ellen?  It's

53

1    really up to you from our perspective.

2          THE WITNESS:  Well, I'm okay, but if anybody else

3    wants a five-minute break, I mean, I don't want to be the

4    one to say let's keep going, but if anybody else wants to.

5          MR. COLLINS:  Well, let me ask this.  Are you about

6    halfway done, Teresa?  Because in that case, it probably

7    makes sense to take a break.  If you've got a half hour

8    left, you know, let's blow through it.  I mean, why don't

9    you make the decision.

10         MS. BECVAR:  Yeah.  I would say I have well over an

11   hour and a half left.  So let's take a break now.  Seems

12   like a good spot.

13         MR. COLLINS:  Makes sense.  Let's take a break.

14         (Whereupon, a break was taken.)

15   BY MS. BECVAR:

16   **Q.**    So, Ms. Motta, did you click on the next

17   exhibit, Exhibit A?

18   **A.**    **I was ready to, and then you said before we**

19   **do that, so I didn't, but should I click on it now?**

20   **Q.**    Yes, go ahead and open that up.

21   **A.**    **Okay.**

22   **Q.**    So --

23   **A.**    **Okay.  It's open.**

24   **Q.**    What you should be looking at should be titled

**54**

1 37-2278, "Employment Tracks, Compensation and Benefits for
2 Home Health Field Employees." And that is labeled as
3 Bayada 00929 through Bayada 00935.
4        Do you recognize this document?
5     A.   Yes, I do.
6     Q.   And is this the document you identified
7 earlier as the document you reviewed to prepare for your
8 deposition today?
9     A.   Yes.
10     Q.   And other than preparing for this deposition,
11 have you seen this document in any other context?
12     A.   Just when as -- you know, it's something to
13 refer to when I'm working.
14     Q.   Okay. And under what circumstances would you
15 refer to it?
16     A.   If I would need to refer a director to it,
17 you know, if somebody was asking me a question, you know,
18 around this, I would say, "Oh, well, have you looked at
19 Policy 37," you know, and then I would -- in that sort of
20 instance.
21     Q.   And where would a director or yourself access
22 this policy at Bayada?
23     A.   On our portal where all policies are kept.
24     Q.   And when you say portal, you're referring to,

**55**

1 like, an online repository of policies, correct?
2     A.   Correct. Yes.
3     Q.   Are field clinicians also given access to this
4 document?
5     A.   I think they have access to the policies
6 online.
7     Q.   But you sounded unsure. You're not sure?
8     A.   I believe -- I'm almost -- I'm pretty sure
9 they have access to the policies. I know they have access
10 to the clinical policies. Again, I'm not 100 percent, but
11 I know they have access to certain policies.
12     Q.   Okay. Do you know whether there are certain
13 policies that would be restricted from clinician access?
14     A.   No.
15     Q.   Other than having access to this policy
16 through the portal, are field clinicians otherwise given a
17 copy of this policy?
18     A.   I know I would give it out. I can't speak
19 for other directors, but it is something that I would have
20 in front of me and go over with them.
21     Q.   And when you say you would have it in front of
22 you, in what circumstances?
23     A.   If I was in that interview we spoke about
24 earlier, just so they understood, I'd have a policy I

**56**

1 could refer to during that interview.
2     Q.   And when you go over that policy with them, do
3 you then let them keep a copy of it?
4     A.   Sometimes I would if they asked for it.
5     Q.   Other than the information in this document,
6 are clinicians given anything else in writing that tells
7 them how their compensation works?
8     A.   Well, again I'm going through my experience
9 as a director. I would give them an offer letter.
10 I would assume others would, but I'm speaking for myself
11 when I was a director.
12     Q.   And what information -- so did you draft that
13 offer letter that you gave to field clinicians?
14     A.   Should I get out of this? I'm sorry. I'll
15 stay in it if you need me to.
16     Q.   Yeah, if it helps to click away from it so you
17 can see me, certainly do that.
18     A.   Okay. Because I can go back to it. Okay.
19 I'm sorry. Can you repeat that, please?
20     Q.   Yeah. Did you draft the offer letters?
21     A.   Did I draft them? We have offer letters that
22 are drafted through our recruiting office, but again, with
23 that conversation the director has with the recruiter,
24 that would help the recruiter draft it so, you know, that

**57**

1 information is accurate.
2     Q.   Other than documents that we have marked as
3 Exhibit A and the offer letter, can you think of any other
4 documents that would describe a field clinician's
5 compensation for them?
6     A.   No.
7     Q.   I just want to ask you one question about this
8 document right now. So if you want to pull it up again.
9     A.   Sure. Okay.
10     Q.   And go to the second page. If you go down --
11 oops.
12     THE WITNESS: Sorry. My computer just fell.
13     MS. BECVAR: That's okay.
14     THE WITNESS: Can you hear me?
15     MS. BECVAR: Yeah, you sound fine.
16 BY THE WITNESS:
17     A.   Okay. And, I'm sorry, Page 2?
18 BY MS. BECVAR:
19     Q.   Page 2 under Section 2.1.2, Requirements.
20     A.   Okay. I'm there.
21     Q.   Under that first sentence right there, "Must
22 accept the number of patients needed to fulfill their
23 visit guarantee," I just need you to confirm for me. Is
24 the visit guarantee the same as what we've been referring

58

1 to as productivity point minimum?

2    A.    Yes, it's what they were hired to meet as

3 their guarantee.

4    Q.    Is there any difference between a visit

5 guarantee and a productivity point minimum?

6    A.    Well, it's right here in the policy, just

7 this is their visit guarantee.  That's how we refer to it.

8 If you're hired for 30 points, that's the expectation.

9    Q.    That's the visit guarantee, 30 points?

10   A.    For this scenario, yes.  Yep.

11   Q.    Yeah.  Okay -- or, you know, or 28 points or

12 whatever that person's --

13   A.    Right.

14         -- individualized number is.  Okay.

15   A.    That's what that's referring to.

16   Q.    All right.  You can click away from that for

17 now.

18   A.    Okay.

19   Q.    So as area director or division director, is

20 verifying whether field clinicians fulfill their weekly

21 guarantee, was that part of your job responsibility?

22   A.    So the granular part is for the director;

23 however, if I'm overseeing and looking at reports and I

24 see maybe, you know, they were having some challenges with

59

1 productivity, I might then look more -- you know, closer

2 at some of them employees, and maybe when I'm having a

3 meeting with the director, I would maybe have some

4 questions.  But on a day-to-day, that is really the

5 director's responsibility to ensure that's happening.

6    Q.    And when you say you're looking at reports,

7 what is an example of a report that would show you that

8 information?

9    A.    Oh, I don't know the exact name of it, but

10 it's a -- it's pretty much like an umbrella for an office

11 to see how they are doing with their revenue, the cost of

12 service, which that would relate to that.

13   Q.    Did that report come from Homecare Homebase?

14   A.    I believe it is within that Homecare

15 Homebase, and then there's -- oh, my gosh.  You could tell

16 I'm furloughed.  This is terrible.  Oh, analytics or it's

17 something within -- you have to get into Homecare Homebase

18 to get to that.

19   Q.    Okay.  So you don't remember the exact name,

20 but you --

21   A.    Right.

22   Q.    You accessed it through the Homecare Homebase

23 system, correct?

24   A.    Correct.

60

1    Q.    Okay.  And so Homecare Homebase is the way

2 that Bayada tracks the number of productivity points a

3 clinician earns on a weekly basis, right?

4    A.    Yes.

5    Q.    While you were serving as division director,

6 did any of the offices you oversaw have trouble with

7 clinicians not meeting their weekly visit guarantee?

8    A.    It's -- I mean, it all depends on how busy

9 that office is.  So at that point, obviously, they might

10 have challenges.  Some patients go into the hospital, and

11 sometimes that's where clinicians may have to see clients

12 that another clinician, you know, kind of -- so it all

13 depends.

14   Q.    And so are there other reasons an office would

15 be less busy for a period of time?

16   A.    Like I said, if a lot of patients go into the

17 hospital at one time, that could be.  That's a big reason.

18   Q.    And so if a single field clinician fails to

19 meet their productivity in a week, how is that addressed?

20   A.    Well, the client services manager in the

21 office typically would have a conversation with that

22 clinician to talk about maybe, you know, that there's a

23 nurse maybe that is a lot more busy in a certain area, and

24 that client services manager may ask that person to help

61

1 out to, you know -- to help her get to her productivity,

2 but that conversation -- so it's a conversation that the

3 client services manager has with that particular employee.

4         And then if there might be some audits, let's

5 say, in the office that we spoke about earlier, there may

6 be a time where that client services manager will ask that

7 clinician to come in to do that.

8    Q.    Is the client services manager generally the

9 person responsible for assigning patients among the

10 various field clinicians?

11   A.    Yes.

12   Q.    So if a field clinician fails to meet their

13 productivity minimum, is paid time off ever deducted?

14   A.    The only time that would be deducted is --

15 let's say that instance I just gave you, they're low, and

16 there weren't clients to be seen; we would ask them to

17 come into the office to do audits, and if they say, "I'm

18 not going to come do that," or anything like that, in that

19 case, we would do something like that.

20   Q.    To your knowledge, does Bayada have a written

21 policy governing when those PTO deductions are made?

22   A.    I can't think of a policy off the top of my

23 head.

24   Q.    So this, what you just described to me, if

# DEPOSITION OF ELLEN MOTTA

**62**

1  they are low on productivity and there are no patients to

2  see and they refuse to do an audit, then their PTO is

3  deducted, where does that come from?

4      **A.      What do you mean where does that come from?**

5  **I'm sorry.**

6      Q.      I mean if it's not written anywhere, how did

7  this practice arise, to your knowledge?

8      **A.      Again, I can't refer to a policy.  It's**

9  **just -- it's something that we -- I'm sorry.  I don't know**

10 **the policy.  I can't think of a policy.  I apologize.**

11     Q.      Oh, that's fine.  Do you know when you first

12 learned of the practice to deduct PTO?

13     **A.      It's just a practice that we have done, you**

14 **know.  It's definitely a discussion, again, at the time of**

15 **the interview where I have a discussion with them about**

16 **the commitment.  You know, the commitment is meeting a**

17 **certain productivity of clients per week.**

18         **If that's not able to be done, then the**

19 **alternative, which is discussed at interview, you may come**

20 **in and do audits, things like that, and at that point if**

21 **that does arise once they're working and they are not able**

22 **to do it or they say, "No, I'm not coming back in," that's**

23 **where I would have a discussion that as a result, we would**

24 **just have to use some PTO.**

**63**

1      Q.      Okay.  And is PTO ever deducted in a

2  circumstance that a clinician did not refuse to do

3  additional work?

4      **A.      Not to my knowledge.**

5      Q.      Let's say they came in to do audits, and they

6  are still, you know, 2 points short.  Would PTO still be

7  deducted in that situation?

8      **A.      No.  At that point, they would get their**

9  **guaranteed salary.**

10     Q.      And who makes that decision whether to make a

11 PTO deduction or not?

12     **A.      So the CSM, their managers; however, a lot of**

13 **times they will have discussions with the director to**

14 **explain what the situation is just to fill that director**

15 **in.  And, you know, it's a typical practice that would go**

16 **on in an office.**

17     Q.      So this the discussion about deducting PTO

18 that happens between the CSM and the director, is that on

19 a case-by-case basis then?

20     **A.      Not always, because if it's something that,**

21 **again, is understood, the client services manager doesn't**

22 **have to go to the director on every single instance, but**

23 **there could be times where they had that discussion.**

24     Q.      And, I guess, what would be the difference

**64**

1  between a time when a discussion is not needed versus a

2  time when a discussion would be needed?

3      **A.      Maybe the clinician might want the director**

4  **involved.  I mean, it could be something like that where**

5  **then the three of them maybe could talk, just as an**

6  **example.**

7      Q.      So if the clinician maybe raises a complaint

8  or something, the director may get involved; is that --

9      **A.      That's an instance.**

10     Q.      Other than the clinician wanting the director

11 involved, are there instances when the CSM would

12 voluntarily on their own get a director involved?

13     **A.      It's hard to say.  I mean, I guess it's up to**

14 **that CSM if they felt the need to.**

15     Q.      When a clinician's paid time off is deducted

16 for not meeting productivity, how is it determined how

17 much to deduct?

18     **A.      So the end of the week, the decision was made**

19 **to do that based on that scenario, let's say there were 4**

20 **points, it would be based on how much PTO, you know, they**

21 **would have and to equate to that, let's just say they were**

22 **down 4 points.**

23     Q.      And how would those points be converted to PTO

24 hours?  I've seen the deductions out.

**65**

1      **A.      Yeah, I know that's a formula that they used**

2  **behind the scenes that I've -- yeah.**

3      Q.      Okay.  There's a formula.  And do you know the

4  formula?

5      **A.      It's all done -- yeah, it's with the payroll.**

6  **I'm not familiar.**

7      Q.      Is there ever an instance like in this example

8  we're using, where a clinician is 4 points under, when

9  they are permitted to make up those points in a subsequent

10 workweek?

11     **A.      Not to my knowledge because it's -- they do**

12 **get paid weekly.  So it's usually within that week.**

13     Q.      And so when a CSM in conjunction with a

14 director is making a decision whether to deduct PTO, do

15 they ever consult a clinician's time records to help make

16 that decision?

17     **A.      Well, I would think they already did because**

18 **they'll know that they're low.**

19     Q.      And when you say they know that they're low,

20 you're saying they know that they're low on points?

21     **A.      Yeah.  The CSM is responsible -- one of the**

22 **responsibilities is to ensure that the clinicians are**

23 **meeting their requirements.  So they are, or they should**

24 **be, very familiar with all the clinicians that they're**

66

1 responsible for day to day on how busy they are.

2    Q.    So in making sure the clinician meets their

3 requirements, the CSM is looking at the points, correct?

4 Does the CS -- or, I'm sorry, answer that, I guess.

5    A.    Yes.

6    Q.    Is that fair -- okay.

7          Does the CSM ever look at how much time that

8 clinician then spent in visits that week, for instance, or

9 spent on documentation that week in assessing whether a

10 clinician has met requirements?

11    A.    Well, the requirements are based on the

12 visits.  So if they do an admission, it's 2 points, say,

13 for instance.  So that's basically what they are looking

14 at.

15    Q.    Okay.

16    A.    Just -- you know what I mean?

17    Q.    Yes.  And so in this situation where the

18 employee is 4 points under productivity, but their PTO

19 balance is zero, what happens in that situation?

20    A.    So they for a day -- for instance, you're

21 saying that -- well, they wouldn't get paid for their --

22 they're paid salary, so it's, you know, say -- is that

23 what you're asking me?  I mean, they're guaranteed a

24 salary.  So it's not -- what you're asking about PTO is

67

1 different than their still getting a salary.

2    Q.    Okay.  So if their PTO is zero, they're under,

3 there's no PTO to deduct, they just get their weekly pay?

4    A.    Right.  So are you -- you're not asking if

5 they're asking for a day off and they don't have PTO,

6 correct?

7    Q.    No, I'm not.

8    A.    Okay.

9    Q.    I'm not even talking about days off.

10    A.    Okay.

11    Q.    And I guess we should probably -- like, maybe

12 they are 1 or 2 points under.  So they worked a full

13 workweek; they just haven't met their minimum, and they

14 have zero PTO to use.  What happens in that instance?

15    A.    They're guaranteed, you know, that guarantee

16 per week.

17    Q.    So then they get that guaranteed pay, correct?

18    A.    They're getting paid guarantee.

19    Q.    And to your knowledge, is that set forth in

20 writing anywhere?

21    A.    The guarantee, the salary?

22    Q.    Right.

23    A.    Well, that's, again, going back to the offer

24 letter, if that's what you're referring to.

68

1    Q.    Okay.

2    A.    They get paid that --

3    Q.    I'm sorry.  I interrupted you.

4          So the offer letter is where it would be set

5 forth that they get a guaranteed salary no matter what,

6 correct?

7    A.    Right, in that offer letter, yes.

8    Q.    And if we could look back at Exhibit A, if you

9 still have it open.

10    A.    I'm doing that now.

11    Q.    And --

12    A.    Okay.

13    Q.    -- feel free to look through the document, but

14 just confirm for me, is there anything in this document

15 that says paid time off will be deducted when clinicians

16 do not meet their productivity minimum?

17    A.    You're talking about using that PTO that we

18 were just talking about, right?

19    Q.    Right.  Right.

20    A.    Right?  Okay.

21    Q.    Right, using PTO when you're under

22 productivity.

23    A.    No, I don't see that here.

24    Q.    And how does a field clinician learn of that

69

1 policy?

2    A.    That, again, should be a conversation at the

3 time of interview.

4    Q.    And we may have already covered this, but are

5 you aware of where that policy originated?

6    A.    No, I'm not.

7    Q.    And so we talked earlier that if a clinician

8 is under productivity, then they should seek out

9 additional visits, and if there are no visits to provide,

10 other additional work, and to do, those circumstances, did you

11 come up with those on your own?

12    A.    You mean they'll come in -- you're saying

13 there isn't work and for them to come into the office and

14 do audits?

15    Q.    Right.  Right.

16    A.    I did not come up with that on my own.  That

17 was a practice within the practice.

18    Q.    So that was a practice that you did not -- you

19 did not create that practice, correct?

20    A.    Correct.

21    Q.    As a director, do you remember any time when

22 that was not a practice?

23    A.    No.

24    Q.    And do you know or do you remember when you

70

1  learned, first learned of that practice?

2      A.      I don't.  I don't exactly know when that time

3  was.

4      Q.      And do you know whether that practice applies

5  to service offices other than the ones you have had

6  oversight over?

7      A.      I can only speak for the ones I had oversight

8  over.  I would assume they would do that as well, but

9  I can't speak for them.

10     Q.      And why do you assume that they would do that,

11 that other offices would do that as well?

12     A.      Again, it was a practice followed by the

13 other offices.

14     Q.      Have you attended meetings with any other

15 directors or division directors where the topic of PTO

16 deductions has been discussed?

17     A.      Not that I can recall.

18     Q.      And how are the individual field clinicians

19 informed in a week when they have not met productivity

20 that they will be subject to a deduction?

21     A.      Well, again, as I mentioned before, the

22 relationship between the client services manager and the

23 clinician is a very close one.  They should be talking

24 every day, you know, about their schedule, about upcoming

71

1  clients coming onboard.  So that's a discussion that is

2  going on all the time between those two.

3      Q.      If there is an employee who is repeatedly not

4  meeting their productivity minimum, what happens?

5      A.      So with my experience, the client services

6  manager may bring it to a director's attention and say,

7  you know, "This is something I've been noticing."

8              They might also bring the clinical manager

9  into that, and that could be -- maybe they are having

10 difficulty documenting, so it could be time management.

11 So it's important that the three, the director, the client

12 services, and the clinical manager get together to discuss

13 that particular employee to identify maybe what the

14 challenges are.  And depending on what that is, it could

15 be a clinical manager's responsibility to help that

16 individual; client services, you know, to be able to

17 manipulate a schedule, just because that's an art in

18 itself.

19             So I think at that point, that meeting should

20 occur, and then, based on what the findings are, to help

21 that person maybe to turn that around.

22     Q.      So would they provide that clinician with

23 extra training?

24     A.      Possibly.

72

1      Q.      And it sounds like they would definitely

2  provide them with the opportunity for extra counseling,

3  correct?

4      A.      If needed.

5      Q.      Would a clinician potentially be subject to

6  discipline?

7      A.      That's hard to say in that scenario.  I'm

8  just talking about -- we're just talking about identifying

9  it at this point.  So it all depends, I guess, on -- you

10 know, I couldn't answer that with -- basically without

11 having some of that information, more information.

12     Q.      Okay.  If it's a problem that has been

13 identified and it continues, you know, after training,

14 after counseling, is it something that potentially could

15 be subject to discipline?

16     A.      Let's just say it's that documentation -- I'm

17 just bringing up a scenario -- after, again, certain

18 steps, certain meetings, certain counseling, there might

19 be something that would be put in place to, again, help

20 them get there in a more formal structured level, if that

21 was the case.

22     Q.      So something put in place for the employees,

23 are you referring to, like, a performance improvement

24 plan?

73

1      A.      Depending.  I mean, that is something we

2  have, but we would definitely do something prior to that,

3  you know, to be proactive to help them.

4      Q.      If a clinician continuously had trouble

5  meeting their productivity minimum, can their minimum be

6  adjusted?

7      A.      Well, again, that's a meeting with the

8  director, maybe the CSM, the client services to, again,

9  let's identify the problem first, let's see what that is.

10 And if the employee, let's just say, says, "I just can't

11 meet the demands," and, you know, starts talking about

12 other challenges, maybe that would be a discussion that we

13 could maybe decrease their -- you know, or change their

14 track, say.  But it's hard to say.  We'd really have to

15 identify what the challenges were.

16     Q.      And if their productivity minimum is lowered

17 or they change tracks, then would there be a commensurate

18 change in their weekly guaranteed pay?

19     A.      Well, their weekly guarantee would change

20 just because, let's say, they were 30; now they are going

21 down to 20.  Their salary would change.

22     Q.      So using that --

23     A.      That's a conversation -- okay.  Sorry.

24     Q.      Yeah, go ahead.  That's a conversation, you

74

1   were saying?

2       A.      That's a conversation, part of the

3   conversation.  We definitely discuss that so they are

4   fully aware of the changes that would occur if they wanted

5   to drop down or go per diem, let's say.

6       Q.      Okay.  And so in the example you used, if

7   someone was going from 30 to 20 points, and their visit

8   pay is $50 a visit, then their weekly guarantee would go

9   then from -- and Tom can correct me if I'm wrong, from

10  1500 to 1000 a week.  Is it just like math, just like

11  that?

12      A.      Yeah, their visit per point typically would

13  stay the same, but obviously, yes, it would in that with

14  their decrease in visits, their weekly pay would change.

15      Q.      Okay.  Have you received, you personally

16  received any complaints from field clinicians when their

17  PTO is deducted?

18      A.      I can't recall, to be honest, any specific

19  time.

20      Q.      In general, as division director, did

21  clinicians go to you when they had complaints?

22      A.      I mean, normally they go to the director.

23  I'm sure there has been a time that somebody would come

24  directly to me or maybe after they spoke with the director

75

1   about anything, that is.

2       MR. COLLINS:  Hold on.  I don't think Teresa wants

3   you to guess or speculate.  If you have a specific

4   recollection of somebody coming to you, go ahead and tell

5   her, but if you don't --

6   BY THE WITNESS:

7       A.      I can't -- yes, I do not have a specific

8   recollection of them coming to me.

9   BY MS. BECVAR:

10      Q.      Do you know whether CSMs receive any training

11  on the best practices for when to deduct PTO and when not

12  to deduct PTO?

13      A.      That is part of their job.  So when they are

14  hired, they should be going through training, and that

15  would be part of it, the specific, yeah.

16      Q.      And what kind of training do they go through

17  when they're hired?

18      A.      Well, it is office-specific.  So I can only

19  speak to when I was director.  I would typically have them

20  maybe go to another office with a seasoned CSM.  That

21  would be part of their training.

22              We also have what's called an office that we

23  have, it's called a VV office, visit virtual office, that

24  has seasoned CSMs work in that office, and part of what

76

1   they do is they can train new CSMs.  So sometimes I would

2   have them come to train a new CSM, or sometimes if there

3   is already a seasoned CSM in your office, then of course

4   they would help with that training.

5       Q.      So is their primary training then on-the-job

6   shadowing?

7       A.      That's a big part of it, yes.

8       Q.      And what other trainings do they receive?

9       A.      So sometimes I would have them shadow a

10  clinician being that they work so closely together.

11  Sometimes I would also have them go out into the field to

12  shadow clinicians in the field to see exactly what they do

13  is and what their day entails so they have a good grasp of

14  that.

15      Q.      Okay.  Are CSMs typically, like, licensed

16  clinicians?

17      A.      No, that is not a requirement.

18      Q.      Let's pull up another exhibit, G.

19              (Whereupon, Bayada Exhibit G was

20              presented to the witness.)

21  BY THE WITNESS:

22      A.      Okay.  I have that up.

23  BY MS. BECVAR:

24      Q.      This document should be titled "Non-Visit

77

1   Activity vs. Other Pay," and it is labeled Bayada 99423

2   through Bayada 99425.

3               Same question as before:  Do you recognize

4   this document?

5       A.      Yes.

6       Q.      And this heading and all of this information,

7   where does this document originate?

8       A.      I believe this is in the -- what's called our

9   playbook.

10      Q.      Okay.  And do all Bayada employees have access

11  to the playbook?

12      A.      Yes.

13      Q.      So there's a chart in the middle of the page

14  here.  If you could read through it for me and just answer

15  for me whether, to your knowledge, all the types of

16  non-visit activity are accurately described here.  If

17  there's anything inaccurate, let me know, I guess is a

18  better way to put it.

19      A.      Okay.  Okay.

20              Okay.  It's pretty straightforward.

21      Q.      So is there anything inaccurate?

22      A.      Not that I can see.

23      Q.      So based on this chart, the non-visit

24  activities that earn a clinician points are case

78

1  conferencing, correct?

2  **A.      Correct.**

3  **Q.**      Inservice training, correct?

4  **A.      Correct.**

5  **Q.**      Local office activity, correct?

6  **A.      Yes.**

7  **Q.**      And for local office activity, what types of

8  work is included in that category?

9  **A.      I believe that is where it's coming in to do**

10 **the audits.  It's that scenario that we talked about**

11 **before.**

12 **Q.**      Okay.  So if a clinician came in to do audits,

13 it would be entered into the system as local office

14 activity, right?

15 **A.      I believe so.**

16 **Q.**      And then the last one is Unallocated Visit, do

17 you know what that is?

18 **A.      Unallocated?  I can't remember.**

19 **Q.**      Okay.

20 **A.      Sorry.**

21 **Q.**      It says, "Use only as directed by VAS."

22       What is VAS?

23 **A.      That's our accounting office.**

24 **Q.**      Then let's flip to the second page of this

79

1  document.

2  **A.      Okay.**

3  **Q.**      There's another chart to manage Other Pay?

4  **A.      Other Pay.**

5  **Q.**      And the same question, just read through it

6  and let me know if there's anything that is not accurate,

7  to your knowledge.

8  **A.      Okay.  It's small, but I'm doing my best.**

9  **Q.**      I know.  I'm sorry.

10 **A.      That's okay.**

11 **Q.**      Actually, you can zoom in.  That might help.

12 **A.      Oh, right.  Right.  I can.**

13       MR. COLLINS:  Yeah, take your time and zoom in and

14 make sure you can see it.

15       THE WITNESS:  Oh, I see.  Thank you for that.  Yes.

16 Okay.  Okay.

17 BY MS. BECVAR:

18 **Q.**      Is there anything that is inaccurate with this

19 chart?

20 **A.      Not that I'm aware of.**

21 **Q.**      Earlier I asked you about this, about whether

22 clinicians received pay in addition to their guaranteed

23 weekly pay, and you indicated they received a productivity

24 bonus if they achieved points above their minimum,

80

1  correct?

2  **A.      Correct.**

3  **Q.**      And you said you didn't recall that they

4  received any other types of pay, correct?

5  **A.      In order for them to make more, I believe you**

6  **asked, correct?**

7  **Q.**      Right.  Right.

8  **A.      Right.  Not to my knowledge.**

9  **Q.**      Okay.  So does this refresh your recollection

10 of the other types of activities that can entitle a

11 clinician to extra pay?

12 **A.      Like if they took the mileage, things like**

13 **that, transportation?**

14 **Q.**      No, like if they get their weekly guarantee,

15 and then they also get mileage on top of that, right?

16 **A.      Correct.**

17 **Q.**      Right.  And they also get a productivity bonus

18 on top of that, correct?

19 **A.      If they go over and beyond the minimum,**

20 **correct.**

21 **Q.**      Right.  They also get on call pay, right?

22 **A.      If they do on call, that would be extra.**

23 **Q.**      Okay.

24 **A.      I'm sorry.  Yes, that would be extra.**

81

1  **Q.**      So the things in this list are additional pay

2  in addition to the weekly guarantee, right?

3  **A.      Correct.**

4  **Q.**      Do you know, does a director have the

5  discretion to offer extra pay to a clinician for any other

6  reasons other than this list?

7  **A.      I mean, the director, I'd say, would have the**

8  **discretion.  Let's say, for instance, a nurse went out to**

9  **admit somebody, and it was pretty -- it turned out to be**

10 **much more challenging, say, than a typical admission.**

11 **There was just a lot of factors and, you know, just a lot**

12 **more than she thought.  There might be a time where the**

13 **director might say, you know, "You definitely went above**

14 **and beyond."  They might give them more for that.  Sure.**

15 **Q.**      Okay.  So they could do that, correct?

16 **A.      Correct.**

17 **Q.**      All right.  Let's move on to Exhibit H.

18             (Whereupon, Bayada Exhibit H was

19             presented to the witness.)

20       MS. BECVAR:  And let me know when you do have that

21 up.

22       THE WITNESS:  I do have that.

23 BY MS. BECVAR:

24 **Q.**      Okay.  So this is labeled as Bayada 05215

82

1   through 05216.  So if you want to take a minute to just --
2   it's one e-mail.  Just read through the e-mail for me.
3       **A.   Sure.**
4       Q.   Let me know when you're done.
5       **A.   Okay.  Oh, sorry.  I didn't see the bottom**
6   **one.  It's two pages.  I'm sorry.**
7       Q.   Yeah.
8       **A.   Okay.  Okay.**
9       Q.   So do you recognize this e-mail?
10      **A.   I do not.**
11      Q.   And based on the recipients, would you have
12  received that?
13      **A.   If I was a recipient, would I receive this,**
14  **if I --**
15      Q.   No, I mean --
16      **A.   Oh.**
17      Q.   -- looking at who it was sent to, were you in
18  any of those groups, to your knowledge?
19      **A.   Not to my knowledge, no.**
20      Q.   Okay.  And in this recipient line, do you know
21  what these different, I guess, e-mail lists are?
22      **A.   So it looks like WSV is the Wilkes-Barre**
23  **Scranton office.  So it looks like all employees, and the**
24  **WSF, that was other team I was talking about.  They had**

83

1   **two teams in the office.**
2       Q.   Okay.
3       **A.   So that's what those mean.  I don't know what**
4   **BBV -- and ESV, that's the East Stroudsburg Visit office.**
5       Q.   Okay.  So is it possible that BBV is another
6   visit office?
7       **A.   I don't know.**
8       Q.   It's not Berks County?
9       **A.   No, it is -- no, that is not.**
10      Q.   And Jenny Long, we mentioned her before.  She
11  was the director of clinical operations, right?
12      **A.   No.  Jenny was the educator for the division.**
13      Q.   And when you say educator for the division,
14  you're referring to Shamrock division?
15      **A.   Correct.**
16      Q.   So she sent this e-mail to a few groups of
17  employees.
18          At this period of time, January 12, 2014,
19  would you have had any oversight over any of these
20  offices?
21      **A.   I don't believe at that point.**
22      Q.   So I just want to look at Page 2.
23      **A.   Okay.**
24      Q.   At this second enumerated number 2 point, it

84

1   says, "Office time/unallocated time is paid as follows:
2   One visit point equals 1.33 hours equals one hour
3   20 minutes equals 80 minutes."
4           And is that the same as what we discussed
5   before where a point equals 1.33 hours?
6       **A.   That's the one I'm familiar with, the one**
7   **visit point equals 1.33 hours.**
8       Q.   And so then right underneath it, it says, "In
9   order to qualify for 2 points, you must complete
10  160 minutes or two hours and 40 minutes of productive
11  office work time."
12          And is that accurate, to your knowledge?
13      **A.   I -- again, I'm not the one who wrote this.**
14  **I'm not -- I am not even familiar with it.  So I can't**
15  **speak to that.**
16      Q.   Yeah, and I understand that.  I'm just saying
17  is there anything about that, that contradicts your
18  knowledge?
19      **A.   I'm just familiar with that first one we**
20  **spoke about, the one visit equals the 1.33.**
21      Q.   Okay.  And then on the third point there, it
22  says, "Though you are required to come into the offers
23  when you're short of your quota, this can not be completed
24  near the start of the week.  Please front load your

85

1   visits."
2           To your knowledge, is that a requirement that
3   Bayada set?
4       **A.   So that's like a best practice.  What they do**
5   **is when they plan for, say, the following week, the**
6   **suggestion is to appropriately front-load visits.  And, of**
7   **course, when the week comes, that can change everything in**
8   **a minute: Somebody goes into the hospital, somebody**
9   **refuses a visit.  So it's just to start the week where**
10  **they do have some type of a schedule put in place.**
11          **But, of course, as the week comes, that could**
12  **all change.  So that's just basically how we help them**
13  **when they are providing the next week's schedule.**
14      Q.   And is that a best practice for all of the
15  Bayada offices you oversaw?
16      **A.   Yes, best practice for the ones that I could**
17  **speak to.  Yes.**
18      Q.   And then at the very end here is her, Jenny
19  Long's, signature line.
20          Do you know what DPT stands for?
21      **A.   Doctor of physical therapy.**
22      Q.   Oh.  Got it.  Okay.  Let's turn to Exhibit J
23  now.  And you can pull that up.
24

86

1          (Whereupon, Bayada Exhibit J was
2          presented to the witness.)
3   BY MS. BECVAR:
4       **Q.**   So Exhibit J is another e-mail, and it is just
5   one page labeled Bayada 06462.  Same thing, if you want to
6   take a look at that and let me know once you have reviewed
7   it.
8       **A.   Okay.**
9       **Q.**   So this is an e-mail from Michael Hogan,
10  correct? Do you recognize it?
11      **A.   I don't.**
12      **Q.**   At the time this was sent, December 21, 2015,
13  would Michael Hogan have been one of your direct reports?
14      **A.   I believe I just started around there, yes,**
15  **as the division director.**
16      **Q.**   So Michael Hogan had at that point reported to
17  you, right?
18      **A.   Yeah, he could have reported -- I was just**
19  **finishing training, so I don't know if formally he was**
20  **reporting to me or Jean, but it was right around that**
21  **time.**
22      **Q.**   So this first sentence here, he says, "Hi
23  everybody.  I'm sorry for taking longer than I should have
24  to get this in writing for you, but please see below the

87

1   weekly commitment expectations."
2       **Q.**   Do you have any knowledge of the circumstances
3   that prompted Mr. Hogan to send this e-mail?
4       **A.   I do not.**
5       **Q.**   And then he says, "For these weekly commitment
6   expectations."
7          Is it your understanding that from here and
8   moving forward through your tenure as division director,
9   this was a policy that applied to Mr. Hogan's office?
10      **A.   I'm not aware of that.  I don't remember.**
11  **I'm not aware.**
12      **Q.**   And reading through this, did anything strike
13  you as being inaccurate, as far as your understanding of
14  the commitment?
15      **A.   Well, I'm not familiar with -- when you were**
16  **saying with their commitment policy, are you saying as a**
17  **division director if I see anything that wouldn't be a**
18  **practice?**
19      **Q.**   Right.  Yes.
20      **A.   Is that what -- okay.  Okay.  I'm just going**
21  **through each one again.**
22      **Q.**   Yeah, feel free.
23      **A.   Okay.  Okay.  No, that sounds something I'm**
24  **familiar with.**

88

1       **Q.**   And before today, just to be clear, you never
2   saw a copy of this policy, right?
3       **A.   No, I did not.**
4       **Q.**   And so do you know whether a policy like this
5   exists in any other form?
6       **A.   I don't.**
7       **Q.**   You don't know, or it doesn't exist?
8       **A.   No, I don't know if -- I'm not familiar with**
9   **the particular bullet points being somewhere else.**
10      **Q.**   Okay.
11      **A.   I mean, it is -- you asked if I agreed with**
12  **it, and it is an expectation.**
13      MS. BECVAR:  All right.  That is all the questions
14  I have for you today.
15      MR. COLLINS:  I actually don't have any questions.
16          FURTHER DEPONENT SAITH NOT.
17          (Whereupon, the deposition concluded at
18          1:55 p.m. EST)
19
20
21
22
23
24

1 STATE OF ILLINOIS      )

                         )   SS:

2 COUNTY OF COOK        )

3

4         I, ANDREW R. PITTS, C.S.R., a notary public

5 within and for the State of Illinois, do hereby certify

6 that heretofore, to-wit, on August 28, 2020, appeared

7 remotely via Zoom videoconferencing platform, ELLEN MOTTA,

8 in a cause now pending and undetermined in the United

9 States District Court For the Middle District of

10 Pennsylvania, wherein STEPHANIE HIGGINS, for herself and

11 all others similarly situated, are the Plaintiffs, and

12 BAYADA HOME HEALTH CARE, INC. is the Defendant.

13         I further certify that the said ELLEN MOTTA

14 was first administered an oath to testify the truth, the

15 whole truth and nothing but the truth in the cause

16 aforesaid; that the testimony then given remotely by said

17 witness was reported stenographically by me and afterwards

18 reduced to typewriting by Computer-Aided Transcription,

19 and the foregoing is a true and correct transcript of the

20 testimony so given by said witness as aforesaid.

21         I further certify that the signature to the

22 foregoing deposition was waived by counsel for the

23 Defendant and that there were present via Zoom at the

24 deposition the attorneys hereinbefore mentioned.

90

1               I further certify that I am not counsel for

2    nor in any way related to the parties to this suit, nor am

3    I in any way interested in the outcome thereof.

4               IN TESTIMONY WHEREOF:  I certify to the above

5    facts this 2nd day of September, 2020.

6

7                    _____

8                    ANDREW R. PITTS, CSR, RPR
                     LICENSE NO.:  084-4575

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24